

**FILED & ENTERED**

**SEP 12 2018**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY gonzalez  DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:     Blue Global, LLC, Debtor | Case No.:  2:17-bk-10900-ER<br>Adv. No.:  2:17-ap-01434-ER |
| Timothy J. Yoo, Chapter 7 Trustee,<br>                                              Plaintiff<br>v.<br>Zeta Interactive,<br>                                              Defendant | **MEMORANDUM OF DECISION FINDING THAT DEFENDANT ZETA INTERACTIVE IS ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR** |
| | Date:      August 23, 2018<br>Time:     10:00 a.m.<br>Location: Ctrm. 1568<br>               Roybal Federal Building<br>               255 East Temple Street<br>               Los Angeles, CA 90012 |

    At the above-captioned date and time, the Court conducted a hearing on the motion for summary judgment (the "Motion") filed by Defendant Zeta Interactive ("Zeta"). The Court took the matter under submission at the conclusion of the hearing. For the reasons set forth below, the Motion is granted and the Court will enter final judgment in Zeta's favor.[1]

---

[1] The Court considered the following pleadings and papers in adjudicating this matter:
  1) Complaint for: (1) Avoidance and Recovery of Preferential Transfers [11 U.S.C. §§547(b), 550(a), and 551] and (2) Disallowance of any Claims Held by Defendant [11 U.S.C. §502(d)] [Doc. No. 1] (the "Complaint")
  2) Notice of Defendant's Motion for Summary Judgment and Defendant's Motion for Summary Judgment [Doc. No. 39] (the "Motion")
    a) Declaration of William Ettenger in Support of Defendant's Motion for Summary Judgment [Doc. No. 40] (the "Ettenger Decl.")

## I. Facts and Summary of Pleadings

In this preference action, the Chapter 7 Trustee (the "Trustee") seeks to avoid transfers totaling $601,723.52 made by the Debtor to Zeta Interactive ("Zeta") during the ninety-day period prior to the date of the filing of the petition (the "Petition Date"). The Trustee further seeks disallowance of any claim asserted by Zeta, pursuant to §502(d).

The Debtor is a failed Internet-based financial services business. Zeta provides marketing solutions to help brands acquire, grow, and retain customers. Zeta provided services to the Debtor between 2011 and 2016.

Zeta moves for summary judgment in its favor. For purposes of the §547(c) preference defense, Zeta asserts that it conducts business within the affiliate-marketing industry. Zeta offers the testimony of Brian Benenhaley, whom it asserts is an expert in the affiliate marketing industry, in support of its contention that payment practices within that industry are highly variable. Based upon Mr. Benenhaley's testimony, Zeta argues that the payments which the Trustee seeks to avoid were made within the ordinary course of the business of the Debtor and Zeta. In the alternative, Zeta asserts that the payments were made according to ordinary business terms within the affiliate marketing industry.

The Trustee opposes the Motion, contending that a preference action involves factually intensive issues that are not appropriately disposed of in the context of summary judgment. The Trustee contends that there are disputed issues of material fact over the ordinariness of the transfers. Specifically, the Trustee argues that Zeta has focused only on transfers made by the Debtor subsequent to June 2016, even though the Debtor's business relationship with Zeta commenced in 2011. The Trustee asserts that the dispute as to the appropriate time period to be used to assess the ordinariness of the transfers precludes entry of summary judgment.

The Trustee further asserts that Zeta has not established that the affiliate marketing industry is the appropriate industry for purposes of determining whether the transactions at issue were made in the ordinary course of business. The Trustee's position is that the general advertising industry, rather than the more specialized affiliate marketing industry, is the appropriate industry.

In Reply to the Trustee's Opposition, Zeta asserts that the Trustee has failed to demonstrate the existence of a genuine dispute as to any material fact. Zeta notes that the Trustee has not

---

    b)   Notice of Errata and Correction Regarding Defendant's Motion for Summary Judgment (containing inadvertently omitted Expert Declaration of Brian N. Benenhaley) [Doc. No. 46] (the "Benenhaley Decl.")
    c)   Notice of Errata and Correction Regarding Defendant's Motion for Summary Judgment (containing inadvertently omitted CV or Brian N. Benenhaley) [Doc. No. 50]
    d)   Declaration of John Du Wors in Support of Defendant's Motion for Summary Judgment [Doc. No. 52]
3)   Opposition to Defendant's Motion for Summary Judgment [Doc. No. 42] (the "Opposition")
    a)   Evidentiary Objections to the Expert Declaration of Brian N. Benenhaley [Doc. No. 43]
    b)   Evidentiary Objections to Declaration of William Ettenger in Support of Defendant's Motion for Summary Judgment [Doc. No. 44]
    c)   Statement of Genuine Issues in Support of Opposition to Defendant's Motion for Summary Judgment [Doc. No. 45]
    d)   Supplemental Declaration of Jeffrey S. Kwong in Support of Opposition to Defendant's Motion for Summary Judgment [Doc. No. 51]
4)   Reply in Support of Defendant's Motion for Summary Judgment [Doc. No. 47] (the "Reply")
    a)   Defendant's Response to Evidentiary Objections to Declaration of William Ettenger in Support of Defendant's Motion for Summary Judgment [Doc. No. 48]
    b)   Defendant's Response to Evidentiary Objections to the Expert Declaration of Brian N. Benenhaley [Doc. No. 49].

disputed the parties' payment history, the absence of communications between the Debtor and Zeta, or that Zeta did not know the Debtor's financial condition. Zeta asserts that these facts are sufficient to support judgment that the payments are exempt from avoidance under §547(c).

## II. Evidentiary Rulings

In support of its contentions regarding payment practices in the affiliate marketing industry, Zeta offers the testimony of Brian N. Benenhaley. Zeta asserts that Mr. Benenhaley should be treated as an expert witness under Federal Rule of Evidence ("FRE") 702. The Trustee asserts that Mr. Benenhaley's testimony is inadmissible for the following reasons:

1) The testimony is not reliable because it is based only on payments made by the Debtor to Zeta from June 30, 2015 to January 31, 2017, even though the parties' business relationship extended from 2011 to 2017. To opine as to whether the payments were made according to ordinary business terms or in the ordinary course of business, Mr. Benenhaley was required to review payments over the entirety of the parties' business relationship.
2) The testimony is not reliable because it is not supported by any objective data, statistics, or reports.
3) Zeta has not made a sufficient showing that Mr. Benenhaley is qualified as an expert in affiliate marketing.

The Trustee's objections to the admissibility of Mr. Benenhaley's testimony are overruled, and the Court will treat Mr. Benenhaley as an expert witness under FRE 702. Mr. Benenhaley's declaration sufficiently establishes his qualifications to testify as an expert in the area of affiliate marketing. In his declaration, Mr. Benenhaley states that he co-founded Reachsmart Interactive/AdDrive Affiliate Network ("ReachSmart") in 2000. Benenhaley Decl. at ¶5. Mr. Benenhaley was employed by Reachsmart from 2000 to 2014, serving as Chief Operating Officer, General Counsel, and a member of the Board of Directors. *Id.* While at Reachsmart, Mr. Benenhaley developed protocols for the creation and deployment of websites, advertising campaigns, and affiliate marketing programs, helping the company grow from an idea to an enterprise with $35 million in annual revenue. *Id.* At Reachsmart, Mr. Benenhaley negotiated agreements with advertisers and publishers and monitored accounts receivable from advertisers and accounts payable to publishers. *Id.* During his tenure the business facilitated payments of hundreds of millions of dollars between advertisers and publishers. *Id.* Mr. Benenhaley has given presentations on affiliate marketing and performance-based advertising on several occasions, including a presentation at the Directing Marketing Association headquarters in New York. *Id.*[2]

Federal Rule of Evidence ("FRE") 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

[2] Zeta also submitted Mr. Benenhaley's curriculum-vitae ("CV") in support of its contention that he is qualified as an expert. However, the CV was inadvertently omitted from Mr. Benenhaley's declaration and was not filed with the Court until August 20, 2018—only three days before the date of the hearing on the Motion. As a result, the Trustee did not have a meaningful opportunity to respond or object to the CV. Therefore, the Court does not rely upon the CV in determining whether Mr. Benenhaley is qualified as an expert. The CV is unnecessary because Mr. Benenhaley's declaration contains a detailed description of his education, work history, and relevant qualifications.

 a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
 b) the testimony is based on sufficient facts or data;
 c) the testimony is the product of reliable principles and methods; and
 d) the expert has reliably applied the principles and methods to the facts of the case.

Under FRE 702, an expert may be qualified by "experience" or "training." Here, Mr. Benenhaley's declaration amply establishes that he has sufficient experience and training to testify regarding payment practices in the affiliate marketing industry. Mr. Benenhaley's declaration shows that he has first-hand, on-the-ground experience in this very industry. As noted by one bankruptcy court, witnesses who have worked in the industry at issue "may be prime candidates for providing relevant testimony." *Stanziale v. Southern Steel & Supply, LLC (In re Conex Holdings, LLC*, 518 B.R. 269, 286 (Bankr. D. Del. 2014).

The Trustee takes issue with Mr. Benenhaley's testimony because it is not accompanied by any statistical reports or other academic research. While studies and other scientific reports are often useful, it is a fallacy to assume that expert testimony not accompanied by such reports lacks credibility. Particularly in a nascent industry such as Internet-based affiliate marketing, testimony of industry practitioners such as Mr. Benenhaley can be just as useful as academic studies.

The Trustee also asserts that Mr. Benenhaley's opinions are not reliable because he based his conclusions only on payments made by the Debtor to Zeta between June 30, 2015 and January 31, 2017, even though the parties' business relationship extended from 2011 to 2017. The Trustee's objection lacks merit. As Zeta explains in its reply papers, it chose to streamline its Motion by focusing only upon transfers subsequent to June 30, 2016, because the amounts owed to Zeta by the Debtor increased dramatically subsequent to June 2016.

The Court further notes that although the Trustee attacks Mr. Benenhaley for presenting only those transactions subsequent to June 30, 2016, the Trustee did not present to the Court any evidence of payment transactions between the Debtor and Zeta before June 2016. In opposing a motion for summary judgment, a party must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials …." Civil Rule 56(c)(1)(A). To support his position that Mr. Benenhaley's testimony is unreliable because it relies only on transactions subsequent to June 30, 2016, the Trustee was required to present to the Court a history of transactions prior to that date, and point out the ways in which the transactions prior to June 2016 differed materially from the transactions subsequent to June 2016. Because the Trustee could have easily presented such evidence to the Court yet failed to do so, the Court is entitled to presume that the transaction history presented by Zeta accurately reflects the business dealings between the parties.

The Trustee also objects to the Declaration of William Ettenger, Zeta's in-house-counsel. The Trustee asserts that Mr. Ettenger's testimony lacks foundation because his declaration does not specify how long he was employed at Zeta. The Trustee's objections lack merit. Mr. Ettenger's declaration establishes that in his capacity as Zeta's in-house counsel, he is familiar with Zeta's business operations and billing and payment practices. Ettenger Decl. at ¶2. The fact that Mr. Ettenger's declaration does not identify the precise period during which he has been employed at Zeta does not undermine his credibility.

## III. Findings and Conclusions

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Civil Rule 56 (made applicable to these proceedings by Bankruptcy Rule 7056). The moving party has the burden of establishing the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is 'material' only if it might affect the outcome of the case[.]" *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The court is "required to view all facts and draw all reasonable inferences in favor of the nonmoving party" when reviewing the Motion. *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004).

### A. Material Facts as to Which there is No Genuine Dispute

Having reviewed the Motion and supporting evidence and declarations, the Opposition, and the pleadings on file, the Court finds that there is no genuine dispute as to the following material facts:

#### *1. The Debtor and Zeta's Business*

The Debtor, Blue Global, is a failed Internet-based financial services business. Zeta provides marketing solutions for helping brands to acquire, grow, and retain customers. Ettenger Decl. at ¶3. Zeta offers a range of services, including Internet-based advertising known as "affiliate marketing." *Id.* at ¶4. Zeta provided affiliate marketing services to the Debtor between 2011 and 2016. *Id.* at ¶5.

The Debtor used Zeta's services to promote its website and associated services. *Id.* at ¶6. Zeta provided a suite of ad creation, optimization, and marketing services. *Id.* at ¶7. Zeta was paid on a pay-per-lead model, meaning that for every consumer that clicked on a link in one of Zeta's Internet ads, was transited to the Debtor's website, and then provided contact information to the Debtor, the Debtor owed Zeta a payment. *Id.* at ¶8.

The Debtor sold the contact information it gleaned from customers who visited the Debtor's website as a result of clicking on one of Zeta's Internet ads to financial institutions. Deposition of Debtor's authorized representative, Christopher Kay [Doc. No. 52] (the "Kay Depo.") at 64:25–65:6, 68:11–71:16. The information the Debtor collected from potential borrowers that the Debtor would then sell to financial institutions is known as a "lead." *Id.*

#### *2. Payment Characteristics Within the Affiliate Marketing Industry*

Payment practices within the affiliate marketing industry are highly variable, particularly when compared to practices in more traditional forms of media and advertising. Benenhaley Decl. at ¶5. In traditional advertising, an advertiser pays a publisher such as a TV station, newspaper, or website owner a set rate based upon a certain number of impressions. *Id.* The rate may vary based upon the audience of the television program or website, or the circulation of the publication, but the rate is set before the deployment of the media and often paid in advance. *Id.*

There is no variance based upon the effectiveness of the advertisement in generating consumer action. *Id.*

Affiliate marketing is entirely different. *Id.* An advertiser generally promises to pay a publisher a set amount for each consumer action that is recorded that is attributed to the advertisement. *Id.* There is no guarantee an advertiser will receive any payment regardless of how many times the advertisement is displayed. *Id.* The advertiser earns payment only when a consumer clicks on an ad (cost per click) or submits information (cost per lead) or makes a purchase (cost per acquisition). *Id.*

This is made possible by affiliate market attribution technology, which allows the advertiser to identify the source of any traffic to their website from a particular advertisement. *Id.* It is accordingly difficult for an advertiser or a publisher to know how much money will be due from month to month. *Id.* at ¶9. Affiliate marketers must wait until the end of the applicable reporting period (which can be daily, weekly, or monthly depending on the campaign) to finalize invoices, based on how many consumers responded to the advertisement. *Id.* This uncertainty is the primary contributing factor for payment unpredictability. *Id.*

However, there are additional factors that lead to the extreme variance in payment practices often encountered in affiliate marketing. *Id.* Reconciliation of the total number of consumer actions is also a major contributing factor to variances in payment schedules. *Id.* at ¶10. In every affiliate relationship, there is an advertiser and a publisher. Each entity keeps their own track of qualifying actions. *Id.* The total counts of qualifying actions compiled by the advertiser and publisher rarely match. Sometimes, the counts vary widely and the advertiser and publisher must negotiate a compromise. *Id.*

Affiliate publishers also rotate ad campaigns heavily based on response rates, leading to further unpredictability. *Id.* at ¶11. Affiliate marketing agreements do not mandate a set number of impressions. *Id.* This results in publishers heavily rotating advertisements looking for ads that produce the best economic performance for them based on consumer response and the rate paid by the advertiser per qualifying action. *Id.* Thus, it is impossible to forecast even the number of impressions a publisher will generate for any particular advertisement in any reporting period, as publishers rotate ads based on consumer sentiment, quality/freshness of ad creative, and changes in the rates advertisers are willing to pay for qualifying actions. *Id.*

The final factor that is a major contributor to the unpredictability of payment schedules in affiliate marketing is the unique way credit risk is allocated. *Id.* at ¶12. Although some of the world's largest advertisers and content distribution networks engage in affiliate marketing, the majority of affiliate marketers are much smaller and less well known. *Id.* Thus, affiliate marketers often find themselves doing a considerable volume of business with an unfamiliar partner with little credit history. *Id.* Most affiliate agreements are between entities where representatives of the respective businesses have never met in person. *Id.* Advertisers want to vet publishers thoroughly to minimize the risk of fraud, and publishers often aggressively manage the extension of credit to avoid over-exposure for non-payment. *Id.* Publishers often demand accelerated payments at intervals that would be unthinkable in conventional advertising. *Id.* Weekly, bi-weekly, and even daily payments are common, particularly when a publisher is succeeding at drawing consumers to the advertiser's website. *Id.*

Publishers often set credit limits that result in campaigns being taken out of rotation when an advertiser owes a certain amount until a payment is made to reduce the outstanding balance below the limit. *Id.* These payments often come in the form of partial payments made between the issuance of invoices. *Id.* On the converse side, long delays in payments can occur based on

sequential liability clauses included in the agreements between affiliate networks and publishers. *Id.*

It is common in the industry for affiliate networks to reserve the right to withhold payment to publishers until such time as the network receives payment from the advertiser. *Id.* Networks routinely use this to justify making accelerated payments to active publishers who are driving good quality leads and delaying payments to other publishers who have either stopped providing traffic to a campaign or are producing a lower quantity/quality of leads to the advertiser. *Id.*

In the affiliate marketing industry, where advertisers (such as the Debtor) are paid to generate leads, the advertisers often do not pay the affiliate networks (such as Zeta) who played a role in generating the leads until the advertisers have themselves received payment for those leads. Kay Depo. [Doc. No. 52] at 68:11–16. The lead buyers often do not pay the advertisers (here, the Debtor) until they have evaluated the quality of the leads. *Id.* at 68:25–69:3. In evaluating lead quality, lead buyers check for fraud, and sometimes recalculate the amount they will pay for the leads based on chargebacks. *Id.* at 68:25–69:16. Some lead buyers take longer than others to remit payment; payment time also varies depending upon the type of lead being sold. *Id.* at 70:20–71:3. Variability in the amount of time that lead buyers take to pay advertisers is a common phenomenon because it is in the nature of the industry. *Id.* at 71:5–16.

### *3. The Debtor's Financial Condition and Payments Made by the Debtor to Zeta*

On March 17, 2016, the Debtor entered into a Consent Order with the New York State Department of Financial Services (the "NY Department"). Among other things, the Consent Order required the Debtor to make the following payments to the NY Department:
1) $100,000 by no later than April 1, 2016;
2) $100,000 by no later than May 31, 2016;
3) $200,000 by no later than December 31, 2016;
4) $150,000 by no later than June 1, 2017;
5) $150,000 by no later than December 31, 2017;
6) $150,000 by no later than June 1, 2018;
7) $150,000 by no later than December 31, 2018.

Consent Order at ¶28 (attached to Proof of Claim 19-1).

The Debtor made the first payment of $100,000 by the April 1, 2016 deadline. *See Agreement to Amend the Payment Terms Under the March 17, 2016 Consent Order and Establish a Custodial Account for Future Payments* (the "NY Modification Agreement") (attached to Proof of Claim 19-1) (reciting the history of payments made by the Debtor under the Consent Decree). On May 24, 2016, the Debtor informed the NY Department that it would be unable to make the second payment of $100,000 by May 31, 2016 as required by the Consent Order. *Id.* During the month of June 2016, the Debtor made the following payments to the NY Department:
1) $10,000 payment made on June 3, 2016;
2) $10,000 payment made on June 10, 2016;
3) $10,000 payment made on June 17, 2016;
4) $10,000 payment made on June 24, 2016.

*Id.*

On July 19, 2016, the Debtor and the NY Department entered into the NY Modification Agreement, which required the Debtor to initiate recurring Automated Clearing House ("ACH")

transfers to the NY Department of at least $10,000 every seven days into a custodial account until the outstanding penalty amount of $860,000 was satisfied.

The payments required under the Consent Decree, and the payments required under the amended payment schedule imposed by the NY Modification Agreement, imposed a financial burden upon the Debtor. Deposition of Christopher Kay [Doc. No. 51] at 18:4–7 and 58–61.

As set forth in **Table A**, the Debtor made the following payments to Zeta prior to January 25, 2017, the date of the filing of the petition (the "Petition Date")[3]:

## Table A—Payment History

| Invoice Date | Sales Amount | Payment Date | Amount Received | Days Between Invoice Date and Payment Date |
|---|---|---|---|---|
| 6/30/2015 | $55,300.00 | 8/5/2015 | $55,300.00 | 36 |
| 7/31/2015 | $100,169.95 | 9/10/2015 | $100,169.95 | 41 |
| 8/31/2015 | $119,596.31 | 10/14/2015 | $119,596.31 | 44 |
| 9/30/2015 | $110,172.16 | 11/10/2015 | $110,172.16 | 41 |
| 10/31/2015 | $100,226.62 | 12/10/2015 | $100,226.61 | 40 |
| 11/30/2015 | $61,698.33 | 1/6/2016 | $61,698.33 | 37 |
| 12/31/2015 | $143,616.48 | 2/2/2016 | $143,616.48 | 33 |
| 1/31/2016 | $86,940.20 | 3/1/2016 | $86,940.20 | 30 |
| **Payments made after Debtor enters into Consent Decree with NY Department on 3/17/2016:** | | | | |
| 2/29/2016 | $154,929.72 | 4/15/2016 | $25,000.00 | 46 |
| 2/29/2016 | | 4/22/2016 | $25,000.00 | 53 |
| 2/29/2016 | | 4/25/2016 | $29,929.72 | 56 |
| 2/29/2016 | | 4/27/2016 | $75,000.00 | 58 |
| 3/31/2016 | $60,079.52 | 4/29/2016 | $60,079.52 | 29 |
| 4/30/2016 | $49,504.40 | 6/8/2016 | $49,504.40 | 39 |
| 5/31/2016 | $88,215.32 | 7/22/2016 | $88,215.32 | 52 |
| 6/30/2016 | $96,679.57 | 8/16/2016 | $56,680.00 | 47 |
| 6/30/2016 | | 8/19/2016 | $40,000.00 | 50 |
| 7/31/2016 | $121,019.91 | 9/12/2016 | $60,509.52 | 43 |
| 7/31/2016 | | 9/19/2016 | $60,509.96 | 50 |
| **Payments within 90 days of the Petition Date (preference period began on October 27, 2016):** | | | | |
| 8/31/2016 | $198,808.42 | 10/28/2016 | $198,808.42 | 58 |
| 9/30/2016 | $192,880.51 | 11/4/2016 | $47,897.00 | 35 |
| 9/30/2016 | | 11/14/2016 | $47,897.00 | 45 |

---

[3] The evidence before the Court establishes that Zeta sent an invoice to the Debtor on January 31, 2017, demanding payment in the amount of $26,860.00. Doc. No. 40 at p. 40. The Court has excluded this invoice because it is dated subsequent to the Petition Date.

| 9/30/2016 |              | 11/15/2016 | $96,293.94  | 46 |
|-----------|--------------|------------|-------------|----|
| 10/31/2016| $210,555.38  | 12/16/2016 | $210,827.16 | 46 |
| 11/30/2016| $175,321.22  | (This invoice was not paid.) | | |
| 12/31/2016| $166,760.00  | (This invoice was not paid.) | | |

**B. Zeta is Entitled to Summary Judgment in its Favor**

Section 547(b) permits the Trustee to avoid "any transfer of an interest of the debtor in property" if the transfer was:

1) to or for the benefit of a creditor;
2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
3) made while the debtor was insolvent;
4) made—
   a) on or within 90 days before the date of the filing of the petition; or
   b) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
5) that enables such creditor to receive more than such creditor would receive if—
   a) the case were a case under chapter 7 of this title;
   b) the transfer had not been made; and
   c) such creditor received payment of such debt to the extent provided by the provisions of this title.

§547(b)(1)–(5).

For purposes of §547(b), a "transfer" means:

a) the creation of a lien;
b) the retention of title as a security interest;
c) the foreclosure of a debtor's equity of redemption; or
d) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—
   i) property; or
   ii) an interest in property.

§101(54).

It is the Trustee's burden to establish all the elements of §547(b) by a preponderance of the evidence. §547(g); *Hall-Mark Electronics Corp. v. Sims (In re Lee)*, 179 B.R. 149, 155 (B.A.P. 9th Cir. 1995) *aff'd,* 108 F.3d 239 (9th Cir. 1997). Section 547(c) sets forth certain defenses to transfer liability. The Defendant has the burden of establishing that the §547(c) defenses apply, again under the preponderance of the evidence standard. §547(g).

Section 547(c)(2) provides preference defendants with an affirmative "ordinary course of business" defense. The defense recognizes that preference payments made in the "ordinary course of business" should not be avoided. "'[T]he purpose of this [defense] is to leave undisturbed normal financial relations because it does not detract from the general policy of the

preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.'" *Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com)*, 504 F.3d 775, 789 (9th Cir. 2007) (quoting H.R.Rep. No. 595, at 373–74 (1997), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6329).

Section 547(c)(2) provides that an otherwise preferential transfer is not subject to avoidance if he transfer was:

a) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
b) made according to ordinary business terms.

§547(c)(2).

In determining whether transfers are ordinary in relation to past practices under §547(c)(2)(A), courts consider the following factors:

1) the length of time the parties were engaged in the transactions at issue;
2) whether the amount or form of tender differed from past practices;
3) whether the debtor or creditor engaged in any unusual collection or payment activity; and,
4) whether the creditor took advantage of the debtor's deteriorating financial condition.

*Irving Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.)*, 25 F.3d 728, 732 (9th Cir. 1994), *as amended on denial of reh'g* (June 24, 1994).

Although some decisions have stated that the §547(c)(2)(A) inquiry is "subjective," application of §547(c)(2)(A) does not require evaluation of the parties' state of mind. *Edmund J. Wood v. Stratos Product Development, LLC (In re Ahaza Sys., Inc.)*, 482 F.3d 1118, 1125 n. 6 (9th Cir. 2007).

To establish that a payment was "made according to ordinary business terms" under §547(c)(2)(B), a creditor defending a preference action must show the following:

> First the creditor must establish the "broad range" of business terms employed by similarly situated debtors and creditors, including those in financial distress, during the relevant period. *In re Jan Weilert RV, Inc.,* 315 F.3d at 1197–98. Second, the creditor must show that the relevant payments were "ordinary in relation to [these] prevailing business terms." *See In re Kaypro,* 218 F.3d at 1074. In general, § 547(c)(2)(C) should not pose a particularly high burden for creditors. *See In re Jan Weilert RV, Inc.,* 315 F.3d at 1198 (holding only payments which are so unusual as to be "aberration[s] in the relevant industry" do not satisfy [§547(c)(2)(B)]).

*In re Healthcentral.com*, 504 F.3d at 791.

Evaluation of a creditor's §547(c)(2) defense requires the Court to first identify the industry in which the creditor and debtor operate. *Id.* at 791–92. Once that determination has been made, the Court can then assess whether the payments were ordinary in relation to the business terms prevailing within that industry. *Id.*

Where the debtor and creditor have engaged in a long-term business relationship, a transaction is "ordinary" under §547(c)(2)(A) and §547(c)(2)(B) only in cases in which "the debt

and its payment are ordinary in relation to past practices between the debtor and this particular creditor." *Ahaza Sys., Inc.*, 482 F.3d at 1124 (internal citation omitted). In other words, to assess what is "ordinary" among parties who have interacted repeatedly, the Court must "inquire into the pattern of interactions between the *actual* creditor and the *actual* debtor in question, not about what transactions would have been 'ordinary' for either party with *other* debtors or creditors." *Id.* Conducting this inquiry requires the Court to first identify a baseline historical period reflecting the parties' typical payment practices. *Healthcentral.com*, 504 F.3d at 790. The allegedly preferential transfers can then be compared to this historical baseline period to determine whether the §547(c)(2) defenses apply. *Id.*

The parties have not cited, and the Court has been unable to locate, published authority within the Ninth Circuit containing a meaningful discussion of the standards to be employed to select the appropriate historical baseline period. Therefore, in determining whether a genuine dispute exists as to the appropriate baseline period, the Court relies upon authority from other jurisdictions.

The historical baseline "should be based on a time frame when the debtor was financially healthy," *Davis v. R.A. Brooks Trucking Co. (In re Quebecor World (USA), Inc.)*, 491 B.R. 379, 387 (Bankr. S.D.N.Y. 2013), and "should reflect payment practices that the companies established before the onset of any financial distress associated with the debtor's impending bankruptcy." *Unsecured Creditors Comm. of Sparrer Sausage Co., Inc. v. Jason's Foods, Inc.*, 826 F.3d 388, 394 (7th Cir. 2016). Further, the baseline period "should be grounded in the companies' payment history rather than dictated by a fixed or arbitrary cutoff date." Where a Debtor's payment practices abruptly change after a material deterioration in its finances, such that a "new paradigm" with respect to payment practices comes into existence, payments subsequent to the financial deterioration should be excluded from the baseline period. *Siegel v. Russellville Steel Co., Inc. (In re Circuit City Stores, Inc.)*, 479 B.R. 703, 710 (Bankr. E.D. Va. 2012).

### 1. Zeta is Entitled to Summary Judgment on its Claim that the Transfers Were Made Within the Ordinary Course of Business or Financial Affairs of the Debtor and Zeta Pursuant to §547(c)(2)(A)

#### a. There Is No Genuine Dispute that the Debtor Operates Within the Affiliate Marketing Industry

For purposes of the §547(c)(2) defenses, the Court finds that there can be no genuine dispute that the Debtor operates within the affiliate marketing industry. As set forth above, the Court finds that Mr. Benenhaley is qualified to offer expert opinion as to the industry in which the Debtor operates. Mr. Benenhaley has provided a detailed description of why the affiliate marketing industry is the appropriate industry. Specifically, Mr. Benenhaley has explained that the affiliate marketing industry, unlike the general advertising industry, requires customers to make payments only in response to customer action (as opposed to general up-front payments). Mr. Ettenger, Zeta's in-house counsel, has testified that the Debtor paid Zeta on a pay-per-lead model. That is, the Debtor owed Zeta a payment for every consumer that (a) clicked on a link in one of Zeta's Internet ads, (b) was transited to the Debtor's website, and (c) thereafter provided contact information to the Debtor. Given Mr. Benenhaley's testimony that pay-per-lead transactions are characteristics of the affiliate marketing industry, Mr. Ettenger's testimony

further establishes that there can be no genuine dispute that the affiliate marketing industry is the appropriate industry for purposes of §547(c).

The Trustee makes the conclusory assertion that the general advertising industry, as opposed to the more specialized affiliate marketing industry, is the appropriate industry. However, the Trustee has not submitted an expert declaration contesting Mr. Benenhaley's testimony that the Debtor and Zeta operate within the affiliate marketing industry. A party asserting that a fact is genuinely disputed within the context of a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials …." Civil Rule 56(c)(1)(A). The Trustee cannot create a genuine dispute as to the issue of the appropriate industry through mere conclusory assertions, where Zeta has offered credible expert testimony explaining in detail why the affiliate marketing industry is the appropriate for §547(c)(2) purposes. To create a genuine dispute, the Trustee would have been required to submit expert testimony controverting the conclusions reached by Mr. Benenhaley.

The Supreme Court has held that an affidavit containing conclusory allegations not supported by specific facts is not sufficient to defeat entry of summary judgment:

> The object of this provision [Civil Rule 56(c)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit…. Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

The Ninth Circuit has similarly held that an affidavit containing only vague assertions cannot defeat entry of summary judgment. In *Sullivan v. Dollar Tree Stores*, 623 F.3d 770, 779 (9th Cir. 2010), the parties disputed whether Dollar Tree was a "successor in interest" to Factory 2-U under the Family and Medical Leave Act of 1993. *Sullivan*, 623 F.3d at 770. Critical to adjudication of the successor in interest issue was a finding as to how many personnel employed at Factory 2-U had continued to work for Dollar Tree. The court held that Plaintiff's testimony that "[m]ost of the same personnel continued to work when Dollar Tree took Factory 2-U over at my store" was too vague to create a genuine dispute as to a material fact, where Dollar Tree had provided detailed factual assertions about which employees it hired and for what purposes. *Id.* at 779.

Here, the Trustee has not submitted any type of affidavit at all (much less a vague and conclusory affidavit) refuting Mr. Benenhaley's expert testimony that the Debtor and Zeta operate within the affiliate marketing industry. Like the parties against whom summary judgment was entered in *Lujan* and *Sullivan*, the Trustee accordingly has failed to show that the fact that the Debtor and Zeta conducted business within the affiliate marketing industry is subject to genuine dispute.

### b. There is No Genuine Dispute that the Appropriate Historical Baseline Period is June 30, 2015 to January 31, 2017

Next, the Court finds that there can be no genuine dispute that the period of June 30, 2015 to January 31, 2017 is the appropriate historical baseline period for assessing whether the transactions are exempted from avoidance under §547(c)(2).

The Trustee asserts that the historical baseline should not include any payments made subsequent to the Debtor's entry into the Consent Decree. According to the Trustee, such payments are appropriately excluded because the Debtor was experiencing financial distress after entering into the Consent Decree.

As set forth in Section III.A.3, above, the Court finds that there is no genuine dispute that the payments required under the Consent Decree imposed a financial burden upon the Debtor. However, the Trustee has failed to supply evidence showing that the financial burden associated with the Consent Decree resulted in a material deterioration in the Debtor's finances significant enough to cause an abrupt change in the Debtor's payment practices, such that a new paradigm with respect to payment practices came into existence.

**Table B** sets forth the undisputed facts regarding the Debtor's payment practices to Zeta as they existed (a) prior to the preference period, (b) prior to the preference period *and* prior to entry of the Consent Decree, (c) prior to the preference period but subsequent to entry of the Consent Decree, (d) during the preference period, and (e) during the entire period.

## Table B—Descriptive Statistics Re: Payment History

|  | **Average Invoice Amount** | **Average Payment Amount** | **Average Days Between Payment Date and Invoice Date** | **Number of Invoices at Issue During Each Period** |
|---|---|---|---|---|
| **Entire Period** | $120,656.53 | $81,244.67 | 43.95 | 19 |
| **Pre-Preference Period** | $108,739.84 | $70,955.18 | 43.42 | 14 |
| **Pre-Preference and Pre-Consent Decree Period** | $103,627.75 | $97,215.01 | 37.75 | 8 |
| **Pre-Preference but Post-Consent Decree Period** | $83,099.74 | $51,857.13 | 47.55 | 6 |
| **Preference Period** | $188,865.11 | $120,344.70 | 46 | 5 |

In support of his argument that post-Consent Decree payments should be excluded from the baseline period, the Trustee emphasizes that prior to the Consent Decree, the Debtor paid Zeta's invoices in full in an average of 37.75 days. The Trustee notes that subsequent to the Consent Decree, the Debtor took an average of 47.55 days to pay Zeta's invoices in full. According to the Trustee, this difference of approximately ten days, when considered in conjunction with Mr. Kay's testimony that the Consent Decree imposed a financial burden upon the Debtor, establishes that the baseline period should exclude the period subsequent to the Consent Decree.

The Court disagrees with the Trustee's contention that there is a genuine dispute as to the appropriate baseline period. In determining whether a genuine dispute is present, it is important to note that the Court is dealing with a relatively small data set. For the entire period at issue (including the preference and pre-preference periods), there are only nineteen invoices. During the pre-preference period, there are fourteen invoices at issue; during the preference period, there

are five invoices at issue. If the pre-preference period is further subdivided into periods prior and subsequent to entry of the Consent Decree, the data set becomes even smaller. For example, implementing such a division, only eight invoices are at issue during the pre-preference and pre-Consent Decree period; only six invoices are at issue during the pre-preference but post-Consent Decree period.

    Why does this matter? The use of a descriptive statistical measure, such as an average,[4] is a means of identifying a general trend from variable data. The usefulness of an average—or any other descriptive statistical measure—in elucidating general trends is qualified by the variability of the underlying data. Averages have less descriptive power when applied to smaller data sets. Said another way, the smaller the data set, the greater the difficulty in identifying a general trend from a descriptive statistic such as an average.

    Applying these general principles to the Trustee's argument, the fact that the Debtor's average payment time was 47.55 days during the pre-preference but post-Consent Decree period, but only 37.75 days during the pre-preference and pre-Consent Decree period, does not establish a genuine dispute as to the duration of the appropriate historical baseline. Mr. Benenhaley has submitted uncontroverted testimony that payment practices in the affiliate marketing industry exhibit a high degree of variability. Further, the ten-day increase in the Debtor's average payment time which occurred subsequent to entry of the Consent Decree is based upon very small data sets—the pre-preference and pre-Consent Decree period includes only eight invoices, and the pre-preference but post-Consent Decree period includes only six invoices. Given that there is no dispute that payment practices in the affiliate market industry are highly variable, the Court does not view this ten-day difference as significant. The significance of the ten-day difference must be further discounted because the utility of the average in identifying a general trend is somewhat reduced as a result of the small data set.

    In addition, Mr. Kay's deposition testimony further corroborates Mr. Benenhaley's testimony as to the variability of payments. As set forth in Section III.A.2, above, based upon Mr. Kay's testimony, the Court finds that there is no genuine dispute that certain characteristics of the affiliate market industry contribute to high variability in payments. Specifically, in this industry, where advertisers (such as the Debtor) are paid to generate leads, the advertisers often do not pay the affiliate networks (such as Zeta) who played a role in generating the leads until the advertisers have themselves received payment for those leads. Kay Depo. at 68:11–16. The lead buyers often do not pay the advertisers (here, the Debtor) until they have evaluated the quality of the leads; conducting this evaluation requires lead buyers to check for fraud and sometimes recalculate the amount they will pay for leads based on chargebacks. Because the Debtor would typically not pay Zeta until the Debtor itself has been paid, the delays resulting from the time taken by lead buyers to check for fraud or perform recalculations based on chargebacks introduces additional variability into the Debtor's payments to Zeta.

    More important, the Court finds that even if the evidence at issue does give rise to a genuine dispute with respect to the appropriate baseline period, the Trustee would still be unable to defeat Zeta's summary-judgment motion. Assuming *arguendo* that the appropriate baseline period must

---

[4] Published preference decisions use the term "average"; the more precise term, used by statisticians, is "arithmetic mean." (An average is only one of several measures of central tendency; the more precise term "arithmetic mean" facilitates distinctions among various other measures of central tendency, such as the "median" and "mode.") However, because the published decisions—and most lay people—use "average" when they are referring to what statisticians call an "arithmetic mean," the Court uses this more common (but less accurate) nomenclature.

exclude all post-Consent Decree payments, the Trustee has still failed to establish the presence of any genuine dispute making it necessary for this action to proceed to trial.

Applying a truncated baseline period which excludes all post-Consent Decree payments, the Debtor took an average of 37.75 days to pay Zeta. During the preference period, the Debtor took an average of 46 days to pay Zeta. According to the Trustee, the increase in payment time of approximately eight days shows that there is a genuine dispute as to whether the Debtor made the preference payments in the ordinary course of business. The Trustee is mistaken.

As noted, Mr. Benehaley and Mr. Kay's undisputed testimony establishes that payment practices within the affiliate marketing industry are highly variable. The Trustee further overlooks the fact that the average invoice amount during the preference period was $188,865.11, substantially higher than the average invoice amount of $103,627.75 during the pre-preference and pre-Consent Decree period. A review of **Table A** shows that during the pre-preference and pre-Consent Decree period, the Debtor generally took longer to make larger payments. For example, the Debtor took 36 days to pay in full the $55,300.00 invoice dated June 30, 2015, but took 44 days to pay in full the $119,596.31 invoice dated August 31, 2015. Similarly, the Debtor took 37 days to pay in full the $61,698.33 invoice dated November 30, 2015, but took 41 days to pay the $110,172.16 invoice dated September 30, 2015. The exception which proves the rule is the December 31, 2015 invoice of $143,616.48, which the Debtor paid in only 33 days. However, this one exception does not disprove the general trend. Finally, as noted previously, the significance of the approximately eight-day increase in average payment time is reduced by the small data set.

In addition, Mr. Benenhaley, Zeta's expert, has testified that the payments which the Trustee seeks to avoid are consistent with the prior history of the parties. The Trustee did not introduce any expert testimony showing otherwise. Mr. Benenhaley further testified that there is nothing unusual about the fact that the Debtor made partial payments on the invoice dated September 30, 2016, since partial payments are common in the industry. Further, Mr. Ettenger has testified that Zeta was unaware of the Debtor's financial position, and the Trustee has failed to present any evidence establishing any genuine dispute as to this lack of awareness.

For all these reasons, the Trustee has failed to establish the existence of a genuine dispute as to whether the allegedly preferential payments were made in the ordinary course of business between the Debtor and Zeta. Accordingly, Zeta is entitled to summary judgment in its favor under §547(c)(2)(A).

### *2. Zeta is Entitled to Summary Judgment on its Claim that the Transfers Were Made According to Ordinary Business Terms*

As noted, Mr. Benenhaley's declaration testimony establishes the absence of any genuine dispute as to the types of payment arrangements made in the ordinary course of business among parties transacting in the affiliate marketing industry. His declaration further establishes an absence of any genuine dispute as to the facts necessary to show that Zeta is entitled to judgment in its favor under §547(c)(2)(B).

As set forth above, to establish that the transactions were made according to ordinary business terms, Zeta must "establish the 'broad range' of business terms employed by similarly situated debtors and creditors, including those in financial distress, during the relevant period." *Healthcentral*, 504 F.3d at 791. Zeta must then show that the transactions at issue were "ordinary in relation to [these] prevailing business terms."

Mr. Benenhaley's declaration establishes an absence of a genuine dispute as to the following facts. Payment practices within the affiliate marketing industry are highly variable, particularly when compared to practices in more traditional forms of media and advertising. The variability results from the fact that advertisers receive payment only in response to customer action. Affiliate publishers rotate ad campaigns heavily based on response rates, leading to further unpredictability. Affiliate marketing agreements do not mandate a set number of impressions. This results in publishers heavily rotating advertisements looking for ads that produce the best economic performance. Mr. Kay's uncontroverted deposition testimony, discussed in Section III.B.1.b., above, further establishes the high variability of payment practices. As Mr. Kay testified, advertisers (such as the Debtor) do not pay affiliate networks (such as Zeta) until the advertisers themselves have been paid. The high variability in the time it takes lead buyers to pay advertisers thus translates to high variability in the time it takes advertisers to pay affiliate networks.

Considering the high variability in payment practices in the affiliate marketing industry, the Court finds that the transfers which the Trustee seeks to avoid were made according to ordinary business terms. Mr. Benenhaley testifies that in the affiliate marketing industry, "it is not uncommon to see payment patterns that range from net 7 days (or less) up to net 90 days from the date of invoice with partial payments being a common occurrence." Benenhaley Decl. at ¶13. The Trustee has not introduced any expert testimony controverting Mr. Benenhaley's conclusions. The payment terms here are well within the ordinary range of net 7 to net 90 days in the affiliate marketing industry.

The Trustee asserts that a genuine dispute exists regarding the prevailing payment practices within the affiliate marketing industry. The Trustee points to an agreement between the Debtor and Zeta governing media purchases which is titled *Standard Terms and Conditions for Internet Advertising for Media Buys One Year or Lease* (the "Agreement"). The Agreement requires the Debtor to pay Zeta within thirty days of receiving an invoice. Pointing to Mr. Ettenger's testimony that the terms and conditions set forth in the Agreement are contained in all of the Debtor's purchase orders, the Trustee asserts that the Agreement supports a finding that "net 30" payment terms are ordinary in the affiliate marketing industry.

The Trustee's attempt to generate a disputed issue of fact based on inconsistencies between the payment terms set forth in the Agreement and the payment practices that the Debtor and Zeta actually adhered to is unavailing. In determining whether transfers are ordinary for the industry, the issue is the standard payment practices, not the terms that are standard in boilerplate contracts. In *Matter of Tolona Pizza Prod. Corp.*, 3 F.3d 1029, 1031 (7th Cir. 1993), the creditor's invoices imposed payment terms of net 7 days. Noting that the creditor and most of its competitors "pay little or no attention to the terms stated on their invoices, allow most customers to take up to 30 days to pay, and allow certain favored customers to take even more time," the *Tolona* court found that the relevant inquiry was actual payment practices, not payment terms set forth on an invoice. *Tolona*, 3 F.3d at 1033. Here, the Trustee has presented no testimony contradicting Mr. Benenhaley's description of an industry with broadly flexible payment patterns. The Trustee's focus on the alleged inconsistency between the terms set forth in the Agreement, on the one hand, and the Debtor's payment practices and the description of payment practices in the affiliate marketing industry set forth in Mr. Benenhaley's declaration, on the other hand, is nothing more than an exercise in misdirection.

## IV. Conclusion

Based upon the foregoing, Zeta is entitled to summary judgment that the transfers at issue are exempt from avoidance pursuant to §547(c)(2)(A) and §547(c)(2)(B). Because the Trustee's §547(c) claims fail, Zeta is also entitled to summary judgment in its favor as to the Trustee's claim for recovery of the transfers pursuant to §§550–51. Finally, because the transfers are not avoidable, the Trustee's claim for disallowance of any proof of claim filed by Zeta, pursuant to §502(d), also fails.

The Court will enter judgment in Zeta's favor consistent with this Memorandum of Decision.

###

Date: September 12, 2018

Ernest M. Robles
United States Bankruptcy Judge